UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

v.

DILANJAN MILLER,

       Defendant.

Case No. 24-20434
Hon. Laurie J. Michelson

_____

**DEFENDANT DILANJAN MILLER'S SENTENCING MEMORANDUM**
_____

      38 year-old Dilanjan Miller, whose only prior adult conviction[1] is failure to display a valid driver's license, will appear before this Court for sentencing on April 29, 2025, in connection with his guilty plea, pursuant to a Rule 11 plea agreement, to Bank Fraud, in violation of 18 U.S.C. § 1344(2).

      Of course, the "starting point" for the sentencing calculus is the applicable guideline range of eight to fourteen months. *Gall v United States*, 552 U.S. 38, 49 (2007). But, the inquiry does not end there. The parsimony principle enshrined in 18 U.S.C. § 3553(a) mandates the Court to "impose a sentence sufficient, but not

---

[1] When he was sixteen years old, Mr. Miller was a witness to a fatal shooting. Although he initially fled from scene, Mr. Miller, ultimately, made a truthful statement to police about the shooting and later testified in the homicide trial on

1

greater than necessary, to comply with" the purposes of sentencing enumerated therein.

The sentencing judge "may not presume that the guideline range is reasonable; instead, they must make an individualized assessment based on the facts presented." *Gall*, *supra* at 596-597. Thus, in determining the appropriate sentence, the sentencing court should bear in mind that "the punishment should fit the *offender* and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487–88, 131 S. Ct. 1229, 1240, 179 L. Ed. 2d 196 (2011) (emphasis added). *See also Pennsylvania ex rel. Sullivan v Ashe*, 302 US 51, 55, 58 SCt. 59, 82 Led 43 (1937) ("For the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender.")

This is sensible, given human beings, and human lives, are never one-dimensional, and a fair assessment of any individual requires a more nuanced view of the conduct which brings him before the Court. Thus, while both undersigned counsel and Mr. Miller acknowledge the seriousness of his conduct, there is a deal more to him than that. Attached to this memorandum are letters from

---

behalf of the prosecution. Additional details are provided later.

Mr. Miller's mother, friends, former co-worker, and girlfriend.[2] Taken together, they paint a picture of a man who has been intensely devoted to the well-being of family, faith, and redemption. They portray him as a man of generous heart and spirit. And, they also demonstrate his great and sincere remorse.

At bottom, when this four-year-old crime is viewed, as it must be, vis-à-vis Mr. Miller's pre and post-offense conduct, including his efforts to at all other times in his adult life to make an honest living to support his family, a non-custodial sentence is "sufficient but not greater than necessary" to achieve the purposes of § 3553(a).

1. **The nature and circumstances of the offense and the history and characteristics of the defendant**

a. The nature and circumstances of the offense

The Rule 11 plea agreement accurately reflects the nature and circumstances of the offense.

b. The history and characteristics of the defendant.

The instant offense represents 38-year-old Mr. Miller's first serious adult conviction, which is, of course, reflected in his 2-level downward adjustment as a zero-point offender, under USSG §§4C1.1(a) and (b).

For most of his life, Mr. Miller lived in Saginaw, Michigan, with his mother,

---

[2] The letters are collectively attached as Exhibit A.

3

Tammy Reed and his stepfather. Mrs. Reed and Mr. Miller's father, Van Williams, never married, and although Mr. Miller had contact with his father growing up, the relationship has waned in his adult life.

In his early years, Mr. Miller, according to his mother,

> always show[ed] a sense of empathy towards others, often volunteering his time to help those in need. He was always helpful to his teachers. Dilanjan was raised in the church, which has been a guidance and strength for him. Dilanjan was raised with good moral values.

Exh. A, Tammy Reed letter.

As a teenager, that changed. Mr. Miller dropped out of high school in March of 1994, just before his sixteenth birthday, and he started socializing with the "wrong crowd." As Mrs. Reed put it during a telephone call with undersigned counsel, "I told him those boys were not his friends."

By July of 1994, everything came to a head. Mr. Miller, along with a few other boys and young men, witnessed his friend, nineteen-year-old Kevin Bond, fatally shoot a young man who was believed to be Mr. Bond's best friend and the brother of one of the other men in the car.

Although, initially, Mr. Miller fled the scene, he provided the police with an honest account of the circumstances surrounding the murder shortly thereafter. Based in large part on Mr. Miller's statement and his later testimony at trial, Mr.

4

Bond was successfully prosecuted.[3]

In connection with the incident, Mr. Miller was committed to a juvenile detention center for 90 days for fleeing a police officer and carrying a concealed weapon. After his release from custody, Mr. Miller sought to shift the trajectory of his life. He went to live with his mother's sister, Rosie Miller. During a telephone call with undersigned counsel, Mrs. Reed recalled, "Dilanjan knew he needed to get out of Saginaw, so he went to live with my sister in Ypsilanti."

For all intents and purposes, until 2018, Mr. Miller was successful in his efforts. In 2006, he accepted a position at Marsh Plating in Ypsilanti. For the twelve years preceding this offense, he exhibited a strong work ethic and performed his job with integrity. These traits did not completely fall to the wayside during the offense. Indeed, according to his former Marsh Plating colleague, Shafeeqa Khabir, even in the years he served as union president, his conduct was not all bad:

> I worked with Dilanjan at Marsh Plating where he was president of our union. I do understand the crime in which he is being held accountable for is the money in which he took from our union.
>
> Dilanjan has made amends with many of us who worked with him. I never saw him as a bad or evil person even from what he did. I believe he was really going through a hard time. In the time we worked

---

[3] Mr. Miller received immunity for his trial testimony; however, there was no immunity agreement at the time he provided his statement to police.

together I saw his heart was in the right place. When the company wasn't following rules he was making sure they did everything by the contract. He helped numerous of us get our jobs back when we were wrongfully terminated including me. He fought for us and made sure we got treated fairly. So yes it was kind of hard for me to look at him differently when I heard about the money he took. The Dilanjan I know is really a good person with a kind heart. And for all he took he gave a lot back.

In the background, Mr. Miller was struggling. He wrote to probation:

I have never been a troublemaker or criminal [in his adult life], and at first I intended to pay the money back. I was having problems in my marriage and it turned me into someone I did not know and am ashamed of.

***

…I was under a lot of pressure to keep my household stable. My wife and I were having problems and my kids would ask me for things and I wanted to seem like the hero. I wrote the first check to myself saying I would pay it back even if I had to get another job. But then honestly I got greedy and started spending some of the money on things I didn't need but just wanted showing [sic] my wife I could give her what she wanted.

PSR, ¶ 20.

In 2021, Mr. Miller walked away from this crime. And, since then, he has sought to redeem himself. Jeffery Andrews, a friend, describes Mr. Miller's commitment to service:

I met Mr. Miller about a year after he left his job at Marsh Plating. We met because he wanted to do volunteer work and my brother works for Detroit Rescue Mission.

Dilanjan came straight out and told me what he had done. He showed tremendous remorse and asked me if he could donate the clothes and

6

shoes he bought with the union money to the organization because it was too late to return them. That was the beginning of his working with us. Now we work together volunteering at homeless shelter and delivering food at holidays for folks who can't afford it or have trouble with leaving their home. Even with three kids, a baby on the way, working round the clock he makes sure he makes time for our work in the community.

In a similar vein, Alisha Larsh, Mr. Miller's girlfriend of two years – who is expecting his child in September – discusses his good-hearted nature, generosity, efforts to take responsibility for his actions, and his contrition:

> [Dilanjan and I] met in 2015 through common friends, when I was 23 years old, and we started dating in 2023. I was working two jobs. I was working as a caregiver and also at the Ann Arbor recycle center. Dilanjan was in the process of getting a divorce. Two years later and we are now expecting a baby girl in September.
>
> Unfortunately I have been very sick during my pregnancy and it prevented me from being able to work for the first time in my life. Fortunately Dilanjan has been a big help. That is the person I know him as. He is dependable and puts others before himself. He is a proud father. In addition to the daughter we are expecting, he has three children. His role as a father is central to his identity. He works hard to provide for his family, not just financially, but emotionally and spiritually as well.
>
> In terms of his financial support, we do not live a fancy life but he always makes sure we have everything we need. He works overtime at the plant to ensure that. When he told me about the money he took from the union and the way he spent it, he was very emotional and ashamed. I was very surprised when he told me. It is the opposite of the Dilanjan I know. Even though he was going through a very hard time with his marriage, he does not make excuses for what he did. He uses it to better himself and teach others. We have two rules we live by because of it: always be open and honest and do not live beyond

7

your means.

In the two years we have been together, Dilanjan has been someone who takes full accountability for his actions and is deeply committed to personal growth and positive change. In recent years, even though he was not much of a drinker, I've observed his dedication to maintaining sobriety and living a healthier life. He said he does not want any excuses for not being the best person and father he can.

Mr. Miller's friend, Yahtesha Lester, echoes these sentiments:

I am Yahtesha Lester writing a letter on behalf of Dilanjan Miller. I have been knowing him for years. He is one of the most respectful and giving people I know. I understand he pled guilty to a crime in which he stole money from the union of which he was acting as the president. I could not believe when he said it to me. I always seen him as giving to others first and his self last.

Since he told me his truth a few years before I seen him make strides at redemption. He is going to church almost every Sunday he can. He even is helping the kids in Sunday School learn to read. He is living in a simple way and taking care of his kids who he love very much.

… I can say honestly before I found out about him having a charge for this case I seen a big change in him. I know this is a serious offense and I know he does. He is most embarrassed of it and still is trying to steer other people from doing what he did.

Suffice it to say, Mr. Miller has made extraordinary strides toward rehabilitation.

2. **The "need for the sentence" to comport with the traditional purposes of punishment[4] and the need to avoid unwarranted sentencing disparity.**

---

[4] The "traditional purposes of punishment . . . include retribution, rehabilitation, prevention of further crimes by the defendant, and deterrence of the defendant and others who might contemplate committing similar crimes. *Hobbs v. County of*

The first of the statutory factors – that the sentence imposed should "reflect the seriousness of the offense. . . promote respect for the law, and . . .provide just punishment for the offense" – echoes the traditional concept of "retribution." This necessarily includes the two species of deterrence, which call for two distinct analyses: general deterrence is the need to fashion a punishment which will deter the public at large from taking the same course of action as did the defendant; special deterrence is the need to dissuade the defendant himself from future illegal conduct.

Next, the need to avoid unwarranted sentencing disparities, the key word here, of course, is *unwarranted*. *United States v. Newsom,* 428 F.3d 685, 689 (7th Cir. 2005) ("we begin with the observation that § 3553(a) does not ban all disparities; its concern is only with unwarranted disparities."). "[T]his factor concerns national disparities between defendants with similar criminal histories convicted of similar criminal conduct. . ." *United States v. Conatser*, 514 F.3d 508, 521 (6th Cir. 2008). Thus, to the extent defendants with similar criminal histories convicted of similar conduct receive disparate sentences, something must set them apart.

---

*Westchester,* 397 F.3d 133, 158 (2d Cir. 2005) (citing 1 W. LaFave, Substantive Criminal Law § 1.5(a)(2d ed.2003).

Special deterrence is easy. Prior to his involvement in the instant offense, Mr. Miller has no adult criminal history of consequence. Further, Mr. Miller committed this crime while he was experiencing personal hardship, and he walked away from the offense voluntarily. Since that time, he has repeatedly demonstrated extraordinary positive change. Notably, however, this Court need not rely on undersigned counsel's advocacy. In the words of the probation department, "It is highly unlikely the defendant will engage in similar behavior[.]" PSR, ¶ 84.

As for general deterrence, although there is very little evidence general deterrence actually works[5], because it is, nevertheless, a factor, it bears mentioning that Mr. Miller, who has no notable adult criminal history and has otherwise demonstrated extraordinary rehabilitation, will still have a federal felony conviction for the rest of his life. That would seem to be a general deterrent.

Additionally, sentences for individuals who pleaded guilty to offenses related to stealing union funds have been commensurate in severity with the loss amount and offender-specific characteristics. Imposing a sentence other than probation or home confinement would create an unwarranted sentencing disparity. According to U.S. Sentencing Commission's JSIN database, of the

---

[5] *See e.g.* Gary Kleck. *Deterrence: Actual Versus Perceived Risk of Punishment*. Encyclopedia of Criminology and Criminal Justice, November 2018, https://link.springer.com/referenceworkentry/10.1007/978-1-4614-5690-2_408.

> 387 defendants whose primary guideline was §2B1.1, with a Final Offense Level of 11 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure … 206 defendants (53%) … received a sentence of imprisonment in whole or in part[.]

PSR, ¶ 87.

But, according to the Criminal Enforcement data published by the United States Department of Labor[6], offenders sentenced in the past three years, who committed similar crimes with similar loss amounts were sentenced to probation or home confinement:

> **On March 17, 2025**, in the United States District Court for the Southern District of Texas, Houston Division, Israel Valdivia, **former Secretary-Treasurer of International Association of Machinists** and Aerospace Workers (IAMAW) Local Lodge 2198 (located in Houston, Tex.), was **sentenced to three years of probation**. He also was ordered to pay **restitution in the amount of $63,508**, a $10,000 fine, and a $100 special assessment. On November 18, 2024, Valdivia pleaded guilty to one count of embezzlement of union funds, in violation of 29 U.S.C. 501(c).

> **On March 7, 2025**, in the United States Court for the Southern District of New York, John Seid, former **Secretary-Treasurer for International Alliance of Theatrical Stage Employees** (IATSE) Local 306 (located in New York, N.Y.), was **sentenced to three years of probation, which includes six months of home detention.** Seid also was ordered to pay **restitution in the amount of $65,843** and a $100 assessment. On September 13, 2024, Seid pleaded guilty

---

[6] Office of Labor-Management Standards data regarding Criminal Enforcement Actions, U.S. Dept. of Labor, https://www.dol.gov/agencies/olms/criminal-enforcement (last visited April 21, 2025)

to one count of embezzlement of union funds, in violation of 29 U.S.C. 501(c).

On February 28, 2025, in the United States District Court for the Northern District of Ohio, Eastern Division, Kenneth Kleinhenz, former **Treasurer of United Steelworkers** (USW) Local 673 (located in Olmsted Falls, Ohio), was **sentenced to four years of probation, with the first eight months to be served on home detention** and ordered to pay **$89,457 in restitution** and a $100 special assessment. On October 18, 2024, Kleinhenz pleaded guilty to embezzlement, in violation of 29 U.S.C. 501(c).

**On February 3, 2025**, in the United States District Court for the Southern District of New York, Antoine Shepard, former **office administrator of American Federation of Government Employees** (AFGE) Local 1168 (located in Bronx, N.Y.), was **sentenced to one year of probation** and ordered to pay **$32,323, in restitution** and forfeiture, and a $25 special assessment. On October 1, 2024, Shepard pleaded guilty to one count of bank larceny, in violation of 18 U.S.C. 2113(b).

**On November 19, 2024**, in the First Circuit Division Court in the State of Hawaii, Lilinoe Smith, former **Member Services Representative of International Brotherhood of Electrical Workers** (IBEW) Local 1186 (located in Honolulu, Hawaii), was **sentenced to four years of probation** and ordered to pay **$36,201 in restitution.** On July 30, 2024, Smith pleaded guilty to a one-count information for theft in the first degree exceeding $20,000, in violation of Hawaii Revised Statutes Sections 708-830.5(1)(a) and 708-830(1).

**On July 16, 2024**, in the United States District Court for the District of Oregon, Emerald Keever, former bookkeeper for Sheet Metal, Air, Rail, and Transportation Workers (SMART) Local 16 (located in Portland, Ore.), was **sentenced to time served, 3 years of supervised release**, and ordered to pay **restitution totaling $189,119,** and a $600 special assessment. On April 16, 2024, Keever pleaded guilty to five counts of wire fraud and one count of embezzling union funds, in

violation of 18 U.S.C. 1343 and 29 U.S.C. 501(c), respectively.

**On March 25, 2024**, in the United States District Court for the District of Arizona, Elizabeth Dawn Talavera, former **Secretary-Treasurer of American Federation of Government Employees** (AFGE) Local 3694 (located in Waddell, Ariz.), was **sentenced to 48 months of probation.** She was also **ordered to pay $55,766** in restitution and a $100 special assessment. On October 31, 2023, Talavera pleaded guilty to one count of wire fraud, in violation of 18 U.S.C. 1343.

**On March 21, 2024**, in the United States District Court for the Northern District of New York, Jay Garnsey, **former Financial Secretary of United Mine Workers of America** (UMWA) Local 717 (located in Ilion, N.Y.), was **sentenced to four years of probation**, and ordered to pay **$38,173 in restitution** and a $100 special assessment. On September 28, 2022, Garnsey pleaded guilty to one count of embezzlement of union funds, in violation of 29 U.S.C. 501(c).

**On March 11, 2024**, in the United States District Court for the District of Massachusetts, Andrea Anderson, former **employee of the Brotherhood of Shoe and Allied Craftsmen** (located in Lakeville, Mass.), was **sentenced to two years of probation**. She was also ordered to pay **$30,316 in restitution**. On October 31, 2023, Anderson pleaded guilty to one count of embezzlement from a labor organization, in violation of 29 U.S.C. 501(c).

**On February 28, 2024**, in the United States District Court for the District of Idaho, Tamlyn Ulin-Gilson, former **President of American Federation of Government Employees** (AFGE) Local 1273 (located in Boise, Idaho), was **sentenced to five years of probation.** Ulin-Gibson was also ordered to pay **$42,674 in restitution**. On October 5, 2023, Ulin-Gilson pleaded guilty to one count of wire fraud for embezzling union funds, in violation of 18 U.S.C. 1343.

**On November 29, 2023**, in the United States District Court for the

Northern District of Alabama, Ray La Vondie Williams, former **Treasurer of United Steelworkers** (USW) Local 9-2140-S (located in Birmingham, Ala.) was **sentenced to three years' probation** and ordered to pay **$68,325 in restitution** and a $100 special assessment. On June 27, 2023, Williams pleaded guilty to one count of embezzling union funds in the amount of $68,325, in violation of 29 U.S.C. 501(c).

**On November 16, 2023**, in the United States District Court for the District of Puerto Rico, Iara I. Clemente-Rivera, a **member of International Longshoremen's Association** (ILA) Local 1740 (located in San Juan, P.R.), was **sentenced to three years' probation** and ordered to pay **$150,000 in restitution**. On August 16, 2023, Clemente-Rivera pleaded guilty to one count of labor racketeering conspiracy (RICO Act), in violation of 18 U.S.C. 1962(d). In her plea agreement, Clemente-Rivera admitted that she participated in a scheme to collect unlawful payments from shipping companies (employers), and that she concealed those unlawful payments in part through a company called "JCPY," which provided no services.

**On July 17, 2023**, in the United States District Court for the Southern District of Mississippi, Benton Ryals, Jr., former **Financial Secretary of National Association of Letter Carriers** (NALC) Branch 1437 (located in Laurel, Miss.), was **sentenced to six months of home confinement and three years of probation**. He also was ordered to pay **$32,936 in restitution** and a $25 special assessment. On October 3, 2022, Ryals pleaded guilty to one count of false reports, in violation of 29 U.S.C. 439(b).

**On June 12, 2023**, in the United States District Court for the Southern District of Mississippi, Lisa Bennett, former **Business Agent/Secretary Treasurer of Office of Professional Employees International Union** (OPEIU) Local 204 (located in Pascagoula, Miss.), was sentenced to **six months of home confinement and three years of probation**. She was also ordered to pay **$33,236 in restitution** and a $100 special assessment.

**On May 8, 2023**, in the United States District Court for the District of

Arizona, Terry Bean, former **President of American Federation of Government Employees** (AFGE) Local 2401 (located in Prescott, Ariz.), was **sentenced to 60 months of probation**. Bean was also ordered to pay **$80,351 in restitution** and a $100 special assessment. On November 14, 2022, Bean pleaded guilty to one count of wire fraud, in violation of 18 U.S.C. 1343.

**On February 22, 2023**, in the United States District Court for the Southern District of Indiana, Matthew Archer, former **Secretary-Treasurer of Laborers Local 1325** (formerly located in Indianapolis, Ind.), pleaded guilty to two counts of wire fraud for embezzling $91,951 in union funds and filing false LM reports, in violation of 18 U.S.C. 1343. He was then **sentenced to five years of probation** and 50 hours of community service. He was ordered to pay **$84,462 in restitution** and a $200 special assessment. Archer previously paid $9,489 in restitution.

Also instructive is the Fourth Circuit Court of Appeals' decision in *United States v. Pyles*, 272 F. App'x 258, 258 (4th Cir. 2008), on remand from the United States Supreme Court, affirming the district court's variance sentence of probation with six months home confinement from the applicable guideline range of 63 to 78 months imprisonment. In *Pyles*, the defendant, who had two prior convictions for driving under the influence and one for domestic violence, pleaded guilty to aiding and abetting distribution of crack cocaine, though, significantly, the district court explicitly observed that the one count of aiding and abetting "did not actually reflect the extent or seriousness of Pyles' offense…a quintessential crack case involving a significant amount of a dangerous drug, multiple sales, and numerous people." *Id* at. 260. In concluding the sentence was, nevertheless, substantively

15

reasonable, the Court of Appeals discussed at length the district court's analysis of the § 3553 factors – specifically, the defendant's extraordinary pre and post-conviction rehabilitative efforts, which were similar to Mr. Miller's efforts:

> Pyles abruptly stopped using drugs more than six months before he was indicted and that Pyles had continued on a path of rehabilitation by proving himself to be a good employee, repaying past debts, rectifying a DUI offense, and abstaining from drugs.
>
> …a sentence of probation will allow Pyles to complete valuable vocational training and take advantage of available opportunities for advancement at work in the most effective manner…Because Pyles had been monitored for drug use and tested negative at every screening during the six months prior to his indictment, the district court concluded that "incarceration is not necessary to protect the public from further crimes by Pyles…and a sentence of probation that includes home confinement will sufficiently restrict his freedom to deter any risk of future criminal conduct…

The district court, then, went on to acknowledge that although the "variance sentence would indeed create a sentencing disparity relative to other defendants convicted of distributing crack cocaine," it was, nevertheless justified by the Defendant's unique rehabilitation: "[I]ncarceration [of Pyles] would be a gross mistake, a warehousing effort that would be a poor substitute for the positive rehabilitative influence Pyles has found in work, counseling, and education outside the correctional system." *Id*. at 260.

Like Defendant Pyles, Mr. Miller, on his own volition, walked away from this crime. He has submitted to negative drug screens, and he has otherwise been

16

fully compliant with his pretrial release conditions. He has also maintained gainful employment and endeabored to better himself through his faith and service. If the court found appropriate the downward variance from (the artificially low guideline range of) 63 to 78 months imprisonment to a sentence of home confinement, surely a downward variance from eight to fourteen months imprisonment to time served or home confinement is similarly warranted.

Put simply, just as in Mr. Pyles' case, "[I]ncarceration [of Mr. Miller] would be a gross mistake, a warehousing effort that would be a poor substitute for the positive rehabilitative influence [Miller] has found in work, [faith], [service] and [family] outside the correctional system." *Id*. at 260.

## CONCLUSION

Based on the foregoing, a sentence to probation or home confinement is "sufficient but not greater than necessary" to satisfy the factors set forth in 18 USC § 3353(a).

Respectfully submitted,

*/s/ Allison L. Kriger*
Allison L. Kriger
LaRene & Kriger, P.L.C.
500 Griswold, Suite 2400
Detroit, MI 48226
(313) 967-0100
Akriger@gmail.com
Michigan Bar No. 76364

DATED: April 22, 2025